# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BOBBIE JEAN TENHOVE**
        **Plaintiff,**

    **v.**                              **Case No. 12-C-0627**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Plaintiff Bobbie Jean Tenhove applied for social security disability benefits, alleging inability to work due to multiple sclerosis, back problems, and other impairments, but the Social Security Administration ("SSA") denied her application initially and on reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also determined that she was not disabled. The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012). Plaintiff now seeks judicial review of that decision.

## I. APPLICABLE LEGAL STANDARDS

### A.    Standard of Review

The court reviews an ALJ's decision to ensure that it is supported by "substantial evidence" and based on the correct legal standards. Roddy v. Astrue, No. 12-1682, 2013 WL 197924, at *4 (7th Cir. Jan. 18, 2013). Evidence is "substantial" if a reasonable person could accept it as adequate to support the decision. Kastner, 697 F.3d at 646. A decision denying benefits need not discuss every piece of evidence in the record, but when an ALJ fails to

support his conclusions adequately, remand is appropriate.  Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011).  The ALJ may not ignore entire lines of evidence contrary to the ruling, Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003), and he must build an accurate and logical bridge from the evidence to his conclusion, McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011).  The court confines its review to the rationale offered by the ALJ, Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011); the Commissioner's lawyers may not supplement a deficient analysis, see, e.g., Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).

**B.    Disability Standard**

To determine whether a claimant is disabled, an ALJ employs a sequential five-step inquiry, which asks: (1) whether the claimant is employed; (2) if not, whether she has a severe impairment; (3) if so, whether her impairment is one that the Commissioner considers conclusively disabling; (4) if not, whether she possesses the residual functional capacity ("RFC") to perform her past relevant work; and (5) if not, whether she is capable of performing any work in the national economy.  Kastner, 697 F.3d at 646 (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof in each of the first four steps.  Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).   If she reaches step five, the burden shifts to the Commissioner to establish that the claimant can perform other work that exists in a significant quantity in the national economy.  Id.  ALJs often rely on vocational experts to provide an assessment of the types of occupations in which claimants can work and the availability of positions in such occupations.  Id. (citing Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009)).

2

## II. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Supporting Materials

On October 10, 2008, plaintiff applied for benefits, alleging a disability onset date of October 1, 2007.  (Tr. at 141.)  In a disability report, plaintiff claimed inability to work due to complications of multiple sclerosis ("MS") and back problems, which caused pain, weakness, and loss of balance.  She indicated that her conditions first interfered with her ability to work in June of 2005, and that she became unable to work in October 2007.  She wrote that after her impairments started bothering her she switched to part-time work, then stopped working altogether after July 2007 when her employer wanted her to work full-time, which she could not do.  (Tr. at 161.)[1]

In a February 2009 function report, plaintiff wrote that she got up at 6:00 a.m., woke up her grandchildren and adult son, then helped get the kids ready for school.  Her son went to work.  She indicated that she did not do much more in the day than that.  If her legs felt steady, she would try to do some cooking.  (Tr. at 177.)  Aside from getting the children ready for school, her son (their father) took care of their other needs.  She noted no problems with personal care.  (Tr. at 178.)  Regarding housework, she reported doing some washing and clothes folding but no outside chores.  She needed help carrying things because her left side

---

[1]In this report, plaintiff listed past employment as an assembly worker for a lock manufacturer from March 1998 to March 1999, as a child care worker at a daycare center from 1994 to 1999, and as a teaching assistant from 1999 to June 2005.  (Tr. at 162.)  In a work history report completed in February 2009, plaintiff listed past work as a daycare teacher from September 1994 to January 1999, assembly worker for Master Lock from June 1995 to 1997, teacher's assistant at a school from January 1999 to June 2005, food service worker at a school from August 2004 to June 2005, and food service worker at a daycare from 2007 to July 2008.  (Tr. at 169.)  As discussed later in this decision, only the past lock assembly job is relevant at this point.

3

was weak. (Tr. at 179.) She shopped once per week, if it did not take long. (Tr. at 180.) As hobbies, she watched TV and played bingo. (Tr. at 181.) She indicated that she could lift ten pounds or less, stand fifteen to twenty minutes, walk two to three blocks, and sit one hour. (Tr. at 182.) She used assistive devices including a cane, brace/splint, glasses, and a tub seat. (Tr. at 183.)

In an August 2009 disability report, filed following her request for reconsideration, plaintiff reported new lesions on her brain and side effects from her new medications. She also reported trouble standing, walking, remembering, concentrating, and focusing. (Tr. at 202.) She further reported feeling dizzy and off balance when caring for her personal needs. (Tr. at 206.) Her husband now did most of the cooking, cleaning, laundry, and shopping. (Tr. at 207.)

In a November 2009 disability report filed with her request for a hearing (Tr. at 217), plaintiff reported more back pain, and that her doctor found more lesions on her brain. She also reported more trouble standing and walking. (Tr. at 213.) She indicated that she could, for the most part, care for her personal needs, but her husband and daughter did the majority of the household duties. (Tr. at 216.)

## B. Medical Evidence

In October 2007, plaintiff presented at Froedert Hospital with a complaint of left sided numbness and weakness, and doctors admitted her for work-up of a possible stroke. An MRI showed no signs of stroke, and doctors at that time diagnosed a migraine variant, referring her to Dr. Ann Helms, a neurologist, for migraine management. (Tr. at 360-61, 374.)

Plaintiff saw Dr. Helms on December 10, 2007, reporting continued headaches with flashing lights and nausea, but also left side weakness, slurred speech, easy loss of balance, and growing weakness in her legs throughout the day. (Tr. at 337.) While plaintiff's symptoms

4

had previously been attributed to a migraine, based on this more detailed history, including prolonged left side weakness and several other neurologic complaints; examination showing several abnormalities, including left sided weakness, right sided numbness, and left eye desaturation; and the MRI findings, which revealed a lesion, Dr. Helms suspected a demyelinating disease, such as MS. She ordered further tests and referred plaintiff to Dr. Lea Rayman, also a neurologist. (Tr. at 339.)

On April 2, 2008, plaintiff saw Dr. Rayman, who noted that the December 2007 MS panel was normal, and a repeat brain MRI in February 2008 was unchanged. Plaintiff reported first experiencing symptoms of left arm and leg weakness with prolonged use in 2005, as well as increased fatigue since about 2007. She also complained of short-term memory impairment, word finding difficulty, left hand numbness, and blurred vision. (Tr. at 315-316.) On physical exam, she had some decreased facial sensation and mild lower facial weakness. (Tr. at 317.) Strength testing displayed inconsistent effort and give-way weakness; however, she probably did have slight weakness of her left deltoid. Her gait was slightly wide based. On review of the MRI, Dr. Rayman agreed that the lesions in the white matter were suspicious for MS, but spinal fluid was unremarkable and not supportive of a diagnosis of MS. Dr. Rayman stated: "I believe this patient probably has multiple sclerosis based on her history of symptoms, abnormal neurologic exam and brain MRI appearance." (Tr. at 318.) She recommended plaintiff obtain remaining blood work for MS mimics and MRIs of her cervical and thoracic spine. (Tr. at 318.)

On April 18, 2008, plaintiff underwent MRI scans of the cervical and thoracic spines, which revealed no convincing demyelinating lesions in the spinal cord, but did show degenerative changes in the cervical and thoracic spine, as well as an arachnoid cyst at T-11

5

to T-12.  (Tr. at 383-86.)  During a May 30 follow-up, Dr. Rayman again noted possible MS, scheduling repeat brain scans for three months and referring plaintiff to neurosurgery for an opinion regarding the cyst.  Dr. Rayman also noted possible depression and considered starting plaintiff on an anti-depressant.  (Tr. at 308, 311.)  A June 16, 2008, brain MRI was again suggestive of MS.  (Tr. at 397-98.)

On June 24, 2008, plaintiff consulted with Dr. Christopher Wolfla regarding her back pain, upper and lower extremity numbness and weakness, and the arachnoid cyst revealed on the MRI.  Dr. Wolfla believed it unlikely surgical removal of the cyst would produce significant improvement in her back pain, and plaintiff elected to pursue non-surgical treatment.  (Tr. at 304-305.)

The following month, plaintiff went to the Froedert emergency department following an exacerbation of her MS, characterized by left facial numbness, a swollen left eye, spotty vision, and problems with speech.  On neurological exam, she appeared stable, with her strength within normal limits aside from some weakness of the left upper extremity.  Doctors referred her to neuro-opthalmology for evaluation of her complaints of blurred vision (Tr. at 297, 300, 400-10), and on July 17, 2008, plaintiff saw Dr. Kori-Graf (Tr. at 290.)  Neuro-opthalmology exam showed that plaintiff's visual fields were restricted, but the significance was not clear. Dr. Kori-Graf scheduled further testing to rule out a retinal disorder and referred her for refraction.  (Tr. at 290-94.)

Plaintiff returned to Dr. Rayman in August 2008, complaining of pain in her left calf with walking; the pain in her low back was improved.  (Tr. at 283.)  On review of her latest MRI, Dr. Rayman stated it is possible plaintiff had MS, "but this is not currently clear."  (Tr. at 285.)  She recommended a repeat brain MRI in December 2008.  (Tr. at 285.)

6

Plaintiff returned to Dr. Wolfla in October 2008, noting worsening back and leg pain. She reported that she had to quit her job because she was no longer able to stand. Conservative treatment had not alleviated her symptoms, and she expressed an interest in surgical intervention. Dr. Wolfla discussed with plaintiff the extent to which her possible MS may be contributing to these symptoms, but they elected to proceed with surgery. (Tr. at 271, 274, 279.) On October 21, Dr. Wolfla performed a T-11 to L-2 laminectomy and resection of the arachnoid cyst. The surgery proceeded without complications, and plaintiff was discharged on October 23, with limitations that she not drive a car or lift more than ten pounds. (Tr. at 413-14.)

Plaintiff saw Dr. Rayman in November 2008, for followup of possible MS. She reported that after the surgery her left leg was asymptomatic, without pain, weakness, or numbness. Her right leg and hand still got numb, but she could shake them out. Her lower extremity strength was good; she occasionally lost balance but wasn't falling. (Tr. at 263.) Her gait was slightly wide based and slow. Dr. Rayman stated that plaintiff probably had MS given the brain MRI appearance and abnormalities on neurological exam. She was to return after a repeat brain MRI. Regarding her right hand numbness, Dr. Rayman suspected carpal tunnel syndrome ("CTS"), ordering an EMG and wrist splint. (Tr. at 266.) A December 4, 2008, EMG showed mild bilateral mononeuropathies at the wrist (Tr. at 422), and a December 15, 2008, brain MRI was again suggestive of demyelinating disease, though correlation was required (Tr. at 425).

Plaintiff returned to Dr. Wolfla in December 2008, doing well but with some residual wound sensitivity. Her leg symptoms had improved significantly, and she denied any leg pain. (Tr. at 258.) She was walking about ½ mile per day, had weaned herself from morphine, and

7

occasionally took Oxycodone.  (Tr. at 259.)

On December 29, 2008, plaintiff saw Dr. Rayman for follow-up of probable MS.  Dr. Rayman noted that the EMG showed mild CTS bilaterally.  Plaintiff had not obtained wrist splints or eyeglasses. (Tr. at 251.)  She complained that her left leg constantly felt numb and achy; it improved with lying down.  She was taking Tramadol for back pain, but it did not really help with her leg achiness.  She also complained that her left leg was getting weaker; she was not falling and could walk up and down stairs, but it hurt more to do so.  She reported that she stopped working a few months ago due to left leg weakness and pain.  She also complained of daily shooting pain on the right side of her head.  (Tr. at 252.)  Dr. Rayman noted that plaintiff's history was one of gradual decline, with no clear relapsing/remitting MS symptoms. She opined that plaintiff probably had primary progressive MS, which she decided to treat symptomatically; if plaintiff developed any relapsing/remitting symptoms, they would will start an immunomodulator.[2]  For left leg pain and depression, Dr. Rayman prescribed Cymbalta. Dr. Rayman believed the shooting head pain may be MS related and may improve with Cymbalta.  For fatigue, she would start plaintiff on Provigil if the symptoms continued after taking Cymbalta for a couple of weeks.  (Tr. at 254.)  Plaintiff also saw Dr. James Gosset in the vascular surgery clinic, on referral from Dr. Rayman, regarding her left lower extremity pain. (Tr. at 390.)  Dr. Gosset found the symptoms not consistent with arterial ischemia; rather, her

---

[2]There are four types of MS: (1) relapsing-remitting MS (RRMS), which is characterized by relapse (symptom flare-ups) followed by remission (periods of recovery); (2) secondary-progressive MS (SPMS), in which relapses and partial recoveries occur, but the disability does not fade away between cycles but rather progressively worsens until a steady progression of disability replaces the cycles of attacks; (3) primary-progressive MS (PPMS), which progresses slowly and steadily from its onset; and (4) progressive-relapsing MS (PRMS), a relatively rare type, in which people experience both steadily worsening symptoms and attacks during periods of remission.  http://www.mayoclinic.org/multiple-sclerosis/types.html.

pain was most consistent with neurologic v. musculoskeletal etiology. (Tr. at 394.)

Plaintiff returned to Dr. Wolfla on January 12, 2009, complaining of mild to moderate back pain but denying leg pain. She did note worse coordination and worse sensation in the left leg, likely secondary to her MS. Dr. Wolfla ordered an MRI to rule out new lesions. (Tr. at 245, 626.) A January 20 MRI of the thoracic spine revealed post-operative changes from the T-11 to L-1 level and unchanged S shaped scoliosis of the thoracic spine, but no new lesions. (Tr. at 426-27; 567-68, 673-74, 702-03.) On January 29, Dr. Wolfla found the goals of surgical treatment met and released plaintiff from his care; she was to follow-up with Dr. Rayman regarding her MS. (Tr. at 241, 625.)

On February 5, 2009, plaintiff returned to Dr. Rayman, for follow-up of probable MS. Since her last clinic visit, she had started on Cymbalta for left leg pain and depression, feeling a little better. She complained of fatigue but had not tried Provigil yet. She continued to experience work finding difficulty, but the shooting head pain was gone. (Tr. at 234.) Dr. Rayman noted that plaintiff's course had been slowly progressive, without typical exacerbations and remissions. She suggested supplementation with Vitamin D, started plaintiff on Provigil for fatigue, increased the Cymbalta dose for leg pain, and provided a prescription for a cane. (Tr. at 236, 518.)

On March 30, 2009, plaintiff returned to Dr. Wolfla, reporting gradually worsening back pain, as well as pain radiating into both legs. (Tr. at 616.) Dr. Wolfla ordered a repeat MRI (Tr. at 617), which revealed modest multi-level degenerative disc disease in the upper and mid thoracic spine, and degenerative lumbar spondylosis with diffuse disc bulges at L3-L4 and L4-L5 levels (Tr. at 474, 557-62, 670, 697-700).

Plaintiff saw Dr. Rayman for followup of probable MS on May 17, 2009 (Tr. at 449),

9

complaining of low back pain, radiating into both legs, as well as upper back ache and neck stiffness. She had stopped taking Cymbalta due to an insurance change and felt quite depressed since stopping. (Tr. at 451.) The Provigil did not significantly help her fatigue and was also too expensive. She also complained of sporadic pain behind the right eye and blurred vision all the time, even with glasses. (Tr. at 452.) Dr. Rayman suspected that the eye pain could be due to optic nerve inflammation or migraine. She started plaintiff on Effexor for pain, depression, and fatigue. (Tr. at 454, 616.)

Plaintiff saw Dr. Gosset for left leg pain in the vascular medicine clinic on May 1, 2009. (Tr. at 658.) Dr. Gosset's tests again revealed that her symptoms were not consistent with arterial ischemia as a cause for her lower extremity pain. (Tr. at 660.)

Plaintiff returned to Dr. Rayman for followup of probable MS on July 25, 2009. (Tr. at 443.) She had not tried Effexor for pain and depression because it was too expensive. The Cymbalta had helped, but it was also expensive. She complained of pain, numbness, and weakness in both legs, worse with walking. (Tr. at 446.) Dr. Rayman started plaintiff on amitriptyline, as an inexpensive alternative for neuropathic pain and depression. (Tr. at 448.)

In October 2009, Dr. Rayman noted three new nonspecific lesions on plaintiff's brain MRI, suggestive of progressive MS. It was not clear if plaintiff had the primary progressive or secondary progressive type. Dr. Rayman considered prescribing Interferon, but that would probably worsen her depression. She referred plaintiff to physical therapy to learn strengthening and stretching exercises. The amitriptyline seemed helpful, but sedating, so Dr. Rayman switched to nortriptyline. (Tr. at 598, 604.)

Plaintiff attended one physical therapy session in October 2009, at which she was instructed on a home exercise program. She did not attend a second scheduled appointment

10

and was discharged from therapy.  (Tr. at 658.)

In January 2010, Dr. Rayman indicated that plaintiff probably had progressive MS, marked by a slowly progressive decline without improvement.  She doubted that any immunomodulator would be of much benefit, instead treating the disease symptomatically.  Plaintiff complained of aching pain in the back and legs and depression, a little improved on a small dose of nortriptyline; she could not tolerate a higher dose due to nightmares.  Dr. Rayman recommended starting on Effexor, perhaps adding Baclofen for spasticity.  (Tr. at 588, 594.)

During an April 2010 follow-up, Dr. Rayman again noted that plaintiff's condition was very slowly progressive.  Since there was no good treatments for PPMS, she treated plaintiff symptomatically, including with Effexor for pain.  She also referred plaintiff to Dr. Maryann Gilligan to establish a primary care doctor at the hospital.  (Tr. at 582-83, 587.)

Plaintiff saw Dr. Gilligan on June 7, 2010, complaining of chronic pain in the low back and extremities.  Dr. Rayman had prescribed Baclofen, but plaintiff had not started it yet.  Dr. Gilligan referred plaintiff for more physical therapy.  Dr. Gilligan also noted depression, exacerbated by plaintiff's inability to work due to her medical conditions, which caused stress and strain in her marriage.  (Tr. at 644, 647.)

On June 26, 2010, plaintiff returned to Dr. Rayman for followup of probable MS.  (Tr. at 577.)  Since her last visit, plaintiff had started on Effexor, noting her pain 50% improved, but no help with her mood.  She complained of left side weakness when she used her left arm and leg a lot, or in the cold.  Her speech was slurred at times.  (Tr. at 579.)  Dr. Rayman listed a diagnosis of probable primary progressive MS; the only potential relapsing/remitting symptom was intermittent decreased hearing in right ear.  She considered a trial of oral chemo, such as

11

Imuran, for presumed secondary progressive MS, as there were no good treatments for PPMS per se. She started plaintiff on Aricept for memory and word finding problems, and continued nortriptyline and Effexor for depression. Plaintiff was to start Baclofen for spasticity after taking Aricept for a few weeks. (Tr. at 582.)

On July 27, 2010, plaintiff saw Dr. Gilligan for neck pain, which Tylenol and Baclofen were not helping. (Tr. at 640.) Dr. Gilligan suspected likely muscle strain due to lack of positional change while using the computer, recommending ice/heat and physical therapy. (Tr. at 641-42.) Plaintiff attended therapy later that month, noting that she had last attended therapy in the fall of 2009. At that time, she attended one session, at which she was instructed in a home exercise program; she did not return for further sessions. Plaintiff explained that it hurt when she exercised so she discontinued the program. (Tr. at 636.) Plaintiff reported that she currently required assistance with household chores, cooking, and laundry. She was able to complete activities of daily living, but her arms became so painful she had to stop often. She expressed frustration at her inability to do things. (Tr. at 637.) Therapists instructed her in a stretching program and provided heat to reduce pain. (Tr. at 639.)

In August 2010, Dr. Rayman saw plaintiff for "follow up of progressive MS, possibly primary progressive." (Tr. at 498.) No longer did Dr. Rayman note "probable MS"; the diagnosis now seemed definitive. Plaintiff complained of aching in the back and legs; both legs were painful, numb, and weak, left worse than right. She reported running out of Effexor two weeks ago due to insurance problems, and was more tired, with worsening mood and pain. (Tr. at 500.) Dr. Rayman's impression was "MS, probably primary progressive," with the biggest problems being pain and depression, worse since she stopped Effexor. (Tr. at 503.) Dr. Rayman again noted the lack of good treatments for PPMS per se. (Tr. at 503.)

12

On September 2, 2010, plaintiff advised the physical therapist that she had been doing her stretches, and the increased Effexor dose may be helping somewhat. (Tr. at 632.) Nevertheless, she was discharged from therapy due to little change in pain with stretching or use of heat. (Tr. at 633.)

On September 14, 2010, plaintiff returned to Dr. Gilligan, complaining of ongoing depression, lack of energy, and ambition. She also complained of episodes of nausea and sweats, as well as chronic pain, especially in the right arm/neck. (Tr. at 630.) The Baclofen did not seem to be helping. She reported inability to work due to her medical conditions, which caused financial strain and stress in her marriage. She expressed interest in seeing a therapist. (Tr. at 631.)

Plaintiff went to Solutions Behavioral Health on September 29, 2010, advising the therapist that she needed somebody to talk to because her friends did not understand. She reported getting disgusted at herself because she could not do the things she used to. She spent most of her time home, alone, playing on the computer. (Tr. at 524.) The therapist diagnosed depression, with a GAF of 55,[3] setting goals of improving mood and social contact. She recommended contacting an MS support group and daily walking. (Tr. at 525.) On October 11, plaintiff complained of not sleeping and increased pain. She did get out the previous weekend and reported that she was going "up north" with a friend for one week. She said: "I can't believe I let myself get so dependent on my husband. I'm better now with it (my

---

[3]GAF – the acronym for "Global Assessment of Functioning" – rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 51-60 reflect "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32–34 (4th ed. 2000).

13

MS) than when I first got [diagnosed]." Her mental status was reported as "depressed." The therapist concluded the note: "Enjoy your trip." (Tr. at 523.) On October 25, plaintiff indicated that she did enjoy her trip up north with her friend, reporting that they played cards and talked. She further stated that she did not want to be thought of as lazy and admitted fear of falling. "What gets me most is all the things you used to do now can't." (Tr. at 705.) "Why me, I get tired of struggling." (Tr. at 705.) Her mental status was again listed as depressed. (Tr. at 705.)[4]

On November 8, 2010, Dr. Gilligan completed a report regarding plaintiff's work-related abilities, opining that plaintiff could stand/walk one to two hours in an eight hour day, five to ten minutes without interruption; sit six to eight hours in an eight hour day, one hour without interruption; and occasionally lift/carry ten to twenty pounds, zero pounds frequently. (Tr. at 707-08.) She could never engage in postural movements like climbing, balancing, stooping, crouching, kneeling, and crawling. (Tr. at 708.) She could occasionally reach, handle, feel, and push/pull. She needed to avoid heights and moving machinery (due to vertigo), as well as humidity and vibrations. (Tr. at 709.) Dr. Gilligan indicated that she had treated plaintiff since June 7, 2010, and that her conditions existed since 2005. (Tr. at 710.) In the spaces on the form calling for "medical findings" supporting the assessment, Dr. Gilligan wrote "No formal FCE was done." (Tr. at 708-09.) On last page of the form, she checked that her treatment had been sufficient to form a basis for assessment, but added: "Although it would have been better to have a formal FCE eval. The patient has multiple medical conditions each of which impacts

---

[4]In October 2010, Dr. Rayman provided prescriptions for a cane and grab bars for the shower. (Tr. at 223-25.) Plaintiff also obtained a disabled parking permit and transit plus card. (Tr. at 226-27.)

14

her ability to work, and the form does not specify which condition/impairment is being considered. If you really want to help her get disability she should have a formal FCE." (Tr. at 710.)

## C.    State Agency Doctors

On May 27, 2009, Dr. Pat Chan completed a physical RFC assessment for the SSA, finding plaintiff capable of light work, with only occasional climbing or balancing, and no concentrated exposure to hazards. (Tr. at 434-38.) Dr. Chan noted that Dr. Wolfla restricted plaintiff post-surgery to no driving or lifting more than ten pounds. Dr. Chan found that these "limitations immediately after surgery are not inconsistent with her current light RFC." (Tr. at 440.) On September 12, 2009, Dr. Mina Khorshidi reviewed the medical evidence and affirmed the RFC of May 27, 2009, as written. (Tr. at 482.) On September 14, 2009, Eric Edelman, Ph.D, prepared a psychiatric review technique form, finding no severe mental impairment. (Tr. at 483-95.)

## D.    Hearing Testimony

On November 23, 2010, plaintiff appeared with counsel before ALJ Wayne Ritter. The ALJ also summoned a vocational expert ("VE"), Beth Hoynik. (Tr. at 43.)

### 1.    Plaintiff

The ALJ asked plaintiff why she selected October 1, 2007 as the onset date, and plaintiff responded that at that point she was having chest pain and trouble breathing; she went to the hospital, and they found lesions on her brain. (Tr. at 53.) Plaintiff testified that she last worked in 2005, in the kitchen of a daycare. (Tr. at 53-54.) She indicated that she quit that job because she wasn't able to carry the food trays and other heavy objects required. (Tr. at 54.)

15

The ALJ noted that while the wage information in the file listed no earnings after 2005,[5] in the work history report she completed in February 2009 plaintiff reported last working in July 2008. (Tr. at 54-55.) The ALJ reviewed the work history report with plaintiff, which indicated that she worked as a daycare teacher from 1994 to 1999; assembly worker for Master Lock from 1995 to 1997; teacher's assistant at a school from January 1999 through June of 2005 or 2007; food service worker at a school from August 2004 to June 2005; and at a daycare from 2007 to July 2008. Plaintiff testified "[t]hat sounds about right." (Tr. at 55.) She indicated that her food service jobs at the daycare and school were part-time. (Tr. at 55-56.) The job at Master Lock was full-time and involved sitting most of the day and no lifting. (Tr. at 57.)

Plaintiff testified that she received treatment for depression, including therapy and medication, but had never been hospitalized for it. (Tr. at 58-59.) She testified that she stood 5' 1-½" tall and weighed 185 pounds. She smoked cigarettes but denied regular use of alcohol or any street drugs. (Tr. at 61.)

In the function report she prepared in February 2009, plaintiff reported assisting in the care of her grandchildren, who lived with her (and her adult son) at the time. Plaintiff testified that she could no longer do that, and that her son and grandchildren no longer lived with her; it was now just her and her husband. (Tr. at 61-62.) She testified that she spent most of her time now watching TV and using the computer. (Tr. at 63.)

---

[5]The wage information in the record filed with the court also lists no earnings after 2005. (Tr. at 148-54.) In a disability report completed on December 8, 2008, plaintiff advised the SSA field interviewer that she worked from January 2007 to July 2007, quitting that job because she was unable to go full time at the employer's request. The interviewer noted the lack of wage records related to this employment, but that plaintiff would provide a W2. (Tr. at 156.) On May 12, 2009, plaintiff provided a 2007 Form 1099 from Alphabet Street (the daycare center where she worked), listing other income of $8357.50, along with a note stating that she did not think she worked in 2006. (Tr. at 155; see also Tr. at 190.)

16

### 2.    VE

The VE classified plaintiff's past employment as follows: food assembler, light work, SVP 3; teacher's assistant, light, SVP 4; daycare worker, light, SVP 3; and assembly (i.e., the Master Lock job), sedentary, SVP 2.[6] (Tr. at 65-67.)  The VE testified that there was no specific DOT category for assembling locks.  (Tr. at 66.)  She therefore used the closest analog – "buttons and notions assembler" – in classifying this work.  (Tr. at 67.)   The ALJ determined, based on his review of wage information, that all of these jobs qualified as substantial gainful activity.  (Tr. at 68-70.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work with no more than occasional climbing of ramps, stairs, ladders, or scaffolds, and no concentrated exposure to heights or hazards. (Tr. at 71-72.)  The VE responded that such a person could perform all of plaintiff's past jobs, as well as other occupations such as production, hand packaging, and custodial work.  (Tr. at 72.) If the person  were further restricted to no more than occasional postural movements and limited to simple, routine, repetitive tasks, all of the past jobs save the assembly/Master Lock position would be eliminated; the production, packing, and custodial jobs would still be available.  (Tr. at 73.)  If the person was limited to sedentary work (which would include all of the postural limitations from the second hypothetical), with no more than moderate exposure to extreme cold and concentrated exposure to humidity and vibration, the Master Lock job could still be done, as could the production, hand packing, and custodial jobs.  (Tr. at 73-74.)

---

[6]SVP – the acronym for "Specific Vocational Preparation" – refers to the amount of time required by a typical worker to learn how to do a job.  Under the Dictionary of Occupational Titles ("DOT"), an SVP of 1-2 refers to unskilled work, 3-4 semi-skilled work.  SSR 00-04p.

17

Adding the limitations related to heights and hazards, and simple, routine, repetitive work, would still permit the Master Lock job, as well as the production and packing jobs (in lower numbers). (Tr. at 74-75.) The custodial work would no longer be appropriate, but the VE substituted for that a security monitor job. (Tr. at 75.) Adding the further limitation of a work environment free of fast paced production requirements involving only simple work-related decisions with few, if any, workplace changes, would still allow the Master Lock job, as well as the production, hand packager, and security monitor jobs. (Tr. at 75-76.)

Plaintiff's lawyer added to the last hypothetical a limitation of only occasional fine manipulation, which would eliminate all of the identified jobs save security monitor. (Tr. at 77-78.) Citing a medical note referencing blurred vision, counsel asked if that impairment would impact the security monitor job. The VE responded that this job did require a frequent ability to utilize fine acuity. (Tr. at 78.) The ALJ asked plaintiff if she had glasses, and plaintiff responded that she did but wasn't wearing them that day because they weren't working for her. (Tr. at 79.)

## E.    ALJ's Decision

On January 6, 2011, the ALJ issued an unfavorable decision. The ALJ found that plaintiff last met the insured status requirements on December 31, 2010, and that she had not engaged in substantial gainful activity from October 1, 2007, the alleged disability onset date, through her date last insured. (Tr. at 16.) He further found that, through the date last insured, plaintiff suffered from the severe impairments of obesity, probable multiple sclerosis, scoliosis of the cervical and lumbar spine, thoracolumbar and lumbosacral spine disease, and status-post T1-L2 laminectomies and resection of a thoracolumbar arachnoid cyst. The ALJ noted treatment for depression, hypertension, migraine aura, carpal tunnel syndrome, and vision loss

18

(correctable with glasses), but found that these conditions caused no more than minimal limitation in plaintiff's ability to work and were thus non-severe. (Tr. at 17.) The ALJ then determined at step three that none of plaintiff's severe impairments qualified as conclusively disabling. (Tr. at 18-19.)

The ALJ concluded that plaintiff retained the RFC for sedentary work except that she must avoid moderate exposure to extreme cold and must avoid concentrated exposure to humidity and vibration, use of moving machinery, and unprotected heights and hazards. (Tr. at 19.) In making this determination, the ALJ considered plaintiff's statements, finding her allegations "only partially credible." (Tr. at 21.) He also considered Dr. Gilligan's report, giving it "only limited weight." (Tr. at 22.)

Based on this RFC, the ALJ concluded at step four that plaintiff could perform her past relevant work as an assembler, as actually and generally performed. (Tr. at 22.) In the alternative, the ALJ determined at step five that plaintiff could perform other jobs, identified by the VE, including production worker, packer/hand packager, and security monitor. The ALJ acknowledged that as of March 8, 2009, plaintiff's fiftieth birthday, she would qualify as disabled under the Medical-Vocational Guidelines (Grid Rule 201.14) at step five. Regardless, based on the VE's testimony, the ALJ concluded that through the date last insured plaintiff was capable of performing her past relevant work as an assembler. (Tr. at 23.) The ALJ thus found plaintiff not disabled and denied her application. (Tr. at 24.)

### III.  DISCUSSION

Plaintiff argues that the ALJ's RFC determination is flawed because he failed to conduct a function-by-function assessment of her abilities and improperly discounted Dr. Gilligan's report.  She further contends that the ALJ erred in evaluating the credibility of her statements

19

regarding the severity of her symptoms and limitations.  I address each argument in turn.

## A.    RFC Determination

### 1.    Applicable Legal Standards

Residual functional capacity ("RFC") is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, for five days a week, or an equivalent work schedule. SSR 96-8p; see also Elder v. Astrue, 529 F.3d 408, 414 (7th Cir. 2008) (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96-8p, ability to work only part-time mandates disability finding)).  In determining RFC, the ALJ must first identify the claimant's functional limitations and assess her work-related abilities on a function-by-function basis; only after that may RFC be expressed in terms of the exertional levels of work, e.g., sedentary, light, medium, heavy, and very heavy.  This is so because, at step four of the sequential evaluation process, the first consideration is whether the claimant can perform her past relevant work as she actually performed it. SSR 96-8p.  Thus, as the Seventh Circuit has explained, the ALJ may not at step four describe the claimant's past job in a generic way, e.g., "sedentary," and then conclude, on the basis of the claimant's residual capacity, that she can return to her previous work.  "Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks."  Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991) (citing Strittmatter v. Schweiker, 729 F.2d 507 (7th Cir. 1984)).

RFC may be expressed in terms of an exertional category if it becomes necessary to assess whether the claimant can do her past relevant work as it is generally performed in the

20

national economy. However, without the initial function-by-function assessment of the claimant's physical and mental capacities, it may not be possible to determine whether she is able to do past relevant work as it is generally performed because particular occupations may not require all of the exertional and non-exertional demands necessary to do the full range of work at a given exertional level. SSR 96-8p.

At step five of the sequential evaluation process, RFC must be expressed in terms of the exertional categories when the ALJ determines whether there is other work the claimant can do. However, in order for the claimant to do a full range of work at a given exertional level, she must be able to perform substantially all of the exertional and non-exertional functions required of work at that level. Therefore, it is also necessary at this step to assess the claimant's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the claimant is capable of doing the full range of work contemplated by the exertional level. SSR 96-8p.

As indicated, RFC encompasses both exertional and non-exertional functions. Exertional capacity addresses the claimant's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function should be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull"). SSR 96-8p. Non-exertional capacity considers all work-related limitations and restrictions that do not depend on physical strength, including postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) functions. It also considers the ability

21

to tolerate various environmental factors (e.g., tolerance of temperature extremes).  SSR 96-8p.

Finally, the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations).  SSR 96-8p; see, e.g., Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005) (finding reversal warranted based on the ALJ's failure to provide the narrative discussion required by SSR 96-8p).  The ALJ must also explain how any material inconsistencies or ambiguities in the evidence were considered and resolved.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p.

Opinions from a claimant's treating physician are "entitled to special significance" in determining RFC.  SSR 96-8p.  Such an opinion must be given "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); Roddy, 2013 WL 197924, at *5.  The ALJ must always provide good reasons for discounting the opinion of a treating physician.  Scott, 647 F.3d at 739; see also Jelinek, 662 F.3d at 811.  Even if there are sound reasons for refusing to give the report controlling weight, this does not mean that the report may be rejected.  SSR 96-2p.  Rather, the ALJ must determine what value the report does merit, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion.  Scott, 647 F.3d at 740 (citing Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009)); see also 20 C.F.R. § 404.1527(c).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be

22

adopted, even if it does not meet the test for controlling weight."  SSR 96-2p.

## 2.    Analysis

In the present case, the ALJ found that plaintiff retained the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) except that [she] must avoid moderate exposure to extreme cold.  [She] must also avoid concentrated exposure to humidity and vibration, use of moving machinery, and unprotected heights and hazards."  (Tr. at 19.)

Plaintiff first argues that the ALJ failed to provide a specific, function-by-function assessment of her ability to sit, stand, and walk, including a narrative discussion for each conclusion; merely citing the regulation, which also fails to specify how long a person capable of sedentary work can perform these functions, does not fill in the gap.  Plaintiff notes the medical evidence suggesting limitations in her abilities in these areas, including Dr. Gilligan's report.

The Commissioner reads this as a challenge to the regulation, which can succeed only if it is "arbitrary and capricious."  See Astrue v. Capato ex rel. B.N.C., 132 S. Ct. 2021, 2034 (2012).  The Commissioner further notes that the cited regulation states that sedentary work is generally performed sitting, with walking and standing "required occasionally."  20 C.F.R. § 404.1567(a).  In SSR 83-10, the agency explained that "occasionally" means occurring from very little up to one-third of the time.  Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about two hours of an eight-hour workday, and sitting should generally total approximately six hours of an eight-hour workday.  This, the Commissioner contends, clears up any ambiguity.

In her reply brief, plaintiff clarifies that she challenges not the regulation but the ALJ's RFC determination, specifically, the lack of a narrative discussion regarding her ability to sit,

23

stand, and walk. Plaintiff further notes that the ALJ never cited SSR 83-10 and its definitions of "occasional" and "frequent," making the Commissioner's argument impermissibly post-hoc. See Kastner, 697 F.3d at 648 ("Under the Chenery doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.").

Assuming, without deciding, that the ALJ's RFC determination fell short of SSR 96-8p's narrative requirements, plaintiff fails to demonstrate reversible error.[7] She cites medical evidence documenting pain, numbness, and weakness in her legs, but she points to no specific restrictions on her ability to sit, stand, and walk in these records. More importantly, she offers no explanation as to how the ALJ's putative violation of SSR 96-8p's narrative requirements impacted his step four determination.

Plaintiff's argument regarding Dr. Gilligan's report gains more traction. The ALJ addressed that report as follows:

> [Dr. Gilligan's report] states the claimant has multiple medical conditions, each of which impacts her ability to work. However, the doctor notes repeatedly . . . throughout the paperwork that no formal FCE evaluation was performed. These notations are viewed as a type of disclaimer as to the accuracy of the opinion. Moreover, the doctor's recommended limitations, with a few exceptions, are generally consistent with the above residual functional capacity for sedentary work. Therefore, [the report] is given only limited weight.

_____

[7]The parties dispute the extent to which the violation of a Social Security Ruling constitutes legal error supporting reversal. In Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), the court noted that SSRs are binding on the Social Security Administration, and that such rulings may be relied upon as precedent until they are either expressly superseded, modified, or revoked by later legislation, regulations, court decisions or rulings. Cf. Liskowitz, 559 F.3d at 745 (assuming, without deciding, that violations of SSR 96-8p constitute reversible error). I need not resolve that dispute here. Violations of SSR 96-8p (or other legal standards) may be deemed harmless. See, e.g., Wells v. Astrue, No. 07-C-940, 2009 WL 142404, at *16 (E.D. Wis. Jan. 17, 2009); see also Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (holding that the doctrine of harmless error is fully applicable to judicial review of administrative decisions).

24

(Tr. at 22, record citations omitted.)

Plaintiff argues that the ALJ based his "disclaimer" finding on little more than a hunch, see Wilder v. Chater, 64 F.3d 335, 338 (7th Cir. 1995) (stating that the claimant "is entitled to a decision based on the record rather than on a hunch"), but it was not unreasonable for the ALJ to give the report less weight on this basis. Rather than providing "medical findings" to support her assessment, as the form requested, Dr. Gilligan repeatedly wrote "no formal FCE was done." (Tr. at 708-09.) Dr. Gilligan further wrote that, while the treatment she had provided was sufficient for her to form an opinion, "it would have been better to have a formal FCE eval." (Tr. at 710.) The ALJ may discount an opinion that provides no medical support. See, e.g., Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010).

However, assuming that this "disclaimer" allowed the ALJ to give the report less than controlling weight, he failed to discuss any of the other regulatory factors in deciding what (lesser) weight the report did deserve. See, e.g., Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010) (reversing where the ALJ did not explicitly address the checklist of factors, the proper consideration of which may have caused the ALJ to accord greater weight to the doctor's opinion). Nor did he cite any contrary medical evidence in discounting the report.[8] The ALJ stated that Dr. Gilligan's report was "generally consistent" with the RFC, subject to "a few exceptions" (Tr. at 22), but he did not specify those exceptions. The Commissioner's post-hoc

_____

[8]Dr. Chan found plaintiff capable of light work, but the ALJ did not credit that report. The Commissioner argues that the absence of relapsing/remitting MS symptoms, as documented in Dr. Rayman's notes, contradicts Dr. Gilligan's opinion. But plaintiff did not have relapsing/remitting MS; she had progressive MS. (Tr. at 503.) Thus, the absence of relapsing/remitting symptoms is irrelevant. See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

25

argument that the exceptions are self-evident will not suffice. See SSR 96-2p (noting that a treating source report may contain several medical opinions, which the ALJ should evaluate separately); Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians[.]"); see also Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("The Commissioner insists that 'the record as a whole' fills the gaps in the ALJ's analysis left by the reports of Dr. Brint and Dr. Hawkins. But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

In any event, the ALJ over-estimated the extent to which Dr. Gilligan's report matched the RFC. While Dr. Gilligan's lifting and sitting limitations are consistent with sedentary work, several of the other limitations in her report undermine the ALJ's conclusion as to plaintiff's ability to work. First, Dr. Gilligan opined that plaintiff could never stoop (Tr. at 708), a limitation that "would significantly erode the unskilled sedentary occupational base" and generally leads to a finding of disability. SSR 96-9p. Second, Dr. Gilligan limited plaintiff to sitting no more than one hour without interruption, thus requiring alternating between sitting and standing/walking, which also has the potential to erode the sedentary work base. SSR 96-9p ("The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."). Third, Dr. Gilligan opined that plaintiff could only occasionally reach, handle, feel, and push/pull. (Tr. at 709). "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 96-9p. "Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." SSR

26

96-9p. One would assume that such a limitation would impair the ability to assemble locks (or "buttons and notions"). Indeed, the VE testified in this case that a person capable of only occasional fine manipulation could not perform plaintiff's past work. (Tr. at 77-78.) The ALJ failed to specifically address these limitations. Thus, the matter must be remanded for reconsideration of Dr. Gilligan's report and, if necessary, further testimony from a VE.[9]

## B.    Credibility

### 1.    Applicable Legal Standards

The regulations set forth a two-step process for evaluating symptoms, such as pain, fatigue, or weakness. 20 C.F.R. § 404.1529(c); SSR 96-7p. First, the ALJ must determine whether the claimant has a medically determinable physical or mental impairment that could reasonably be expected to produce her pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to perform basic work activities. SSR 96-7p.

Second, if the claimant has such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit her ability to perform basic work activities. If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of her statements based on the entire case record. SSR 96-7p; see also Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004) (stating that an ALJ may not reject a claimant's testimony based solely on a lack of support in the medical evidence). In making this determination, the

---

[9]It may also be helpful for the ALJ on remand to re-contact Dr. Gilligan. See SSR 96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

27

ALJ should consider the claimant's daily activities; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication she takes to alleviate pain or other symptoms; treatment, other than medication, she receives or has received for relief of pain or other symptoms; any measures other than treatment she uses or has used to relieve pain or other symptoms (e.g., lying flat on her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p; 20 C.F.R. § 404.1529(c).

The reasons for the credibility finding must be grounded in the evidence and articulated in the decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the ALJ simply to recite the regulatory factors. The decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the ALJ gave to the claimant's statements and the reasons for that weight. SSR 96-7p. The reviewing court gives the ALJ's credibility determination special, but not unlimited, deference. Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ must consider the factors set forth in SSR 96-7p and 20 C.F.R. § 404.1529(c), and must support his credibility findings with evidence in the record, Shauger, 675 F.3d at 696. The court has greater freedom to review a credibility determination based on objective factors or fundamental implausibilities rather than subjective considerations (such as the claimant's demeanor), Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000), and may reverse a credibility finding "based on errors of fact or

28

logic," Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006).

**2.    Analysis**

In the present case, after setting the forth the two-step test for evaluating symptoms, the ALJ noted that plaintiff alleged disability based on complications from MS and back problems that caused pain in her feet, legs, and back.  She also claimed weakness on the left side and difficulty maintaining her balance, and that she suffered from depression.  (Tr. at 19.)  The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 20.)  The Seventh Circuit has derided this boilerplate language as "meaningless" because it "yields no clue to what weight the trier of fact gave the testimony." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012); see also Shauger, 675 F.3d at 696; Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010).   Despite consistent condemnation and numerous reversals, ALJs continue to use this "template." See, e.g., Hunt v. Astrue, No. 12-C-46, 2012 WL 3779193, at *14 (E.D. Wis. Aug. 31, 2012).

Use of the boilerplate may be deemed harmless if the ALJ supports his finding with additional reasons that the court is able to follow.  See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).  Later in his decision in this case, the ALJ stated that he found plaintiff's "allegations of symptoms and their effects on functioning . . . only partially credible as they are not fully consistent with the medical evidence of record."  (Tr. at 21.)  However, once the ALJ has found that the claimant suffers from impairments that could reasonably cause her symptoms, he may

29

not disregard her allegations just because they are not fully supported by the medical evidence. See, e.g., Moss, 555 F.3d at 561; Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ also provided several specific reasons for his finding in this case, but they fail to support his conclusion as to plaintiff's credibility.[10] First, the ALJ noted that although plaintiff "is obese, she is not morbidly so." (Tr. at 21.) The factual assertion is true, but how this impacted the ALJ's assessment of plaintiff's credibility went unexplained.[11]

Second, the ALJ noted that while plaintiff's doctor imposed restrictions of no driving or lifting more than ten pounds after her October 2008 back surgery, the doctor did not restrict her from working. The ALJ stated: "These limitations immediately after surgery are not consistent with the claimant's allegation that she was completely disabled from work at that time." (Tr. at 21.) However, plaintiff had already stopped working by this point (Tr. at 279); there was thus no need for Dr. Wolfla to excuse her from work. Nor does it appear that Dr. Wolfla was ever asked to offer an opinion on plaintiff's RFC or ability to maintain full-time work. Further, the ALJ

---

[10]The Commissioner argues that the lack of a "definitive" MS diagnosis in the medical records supports the ALJ's credibility finding. While the ALJ did discuss this issue (Tr. at 21), he did not tie that discussion to credibility. See Golembiewski, 322 F.3d at 916 (stating that SSR 96-7p requires the ALJ to specify the reasons for his finding, and that "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ"). In any event, while earlier medical notes from Dr. Rayman refer to "probable MS" (Tr. at 577), by August 2010 the word "probable" had been dropped (Tr. at 498). Finally, the case the Commissioner cites on this point, Sharp v. Sullivan, No. 89-1982, 1990 WL 93397, at *6 (6th Cir. July 6, 1990), affirmed where, despite claims of disabling hand pain, "the EMGs, X-rays and range of motion tests performed on [the claimant's] fingers, hands, arms, and shoulders were all normal or nearly normal." In the present case, plaintiff's MRIs were not normal.

[11]At 5'2" and 185 pounds, plaintiff's "BMI" (body mass index) is 33.8. http://nhlbisupport.com/bmi/bmicalc.htm. A person with a BMI of 30 is considered obese, 40 or greater morbidly obese. Dornseif v. Astrue, No. 11 C 4335, 2012 WL 1441770, at *9 (N.D. Ill. Apr. 26, 2012), aff'd, 2013 WL 150121 (7th Cir. Jan. 15, 2013). Plaintiff does not allege that the ALJ failed to adequately address her obesity.

overlooked the evidence that plaintiff returned to Dr. Wolfla in March 2009 with worsening back pain (Tr. at 616-17), as well as Dr. Rayman's subsequent notes documenting "slowly progressive decline without improvement." (Tr. at 594.)

Third, the ALJ noted that while plaintiff complained of left-sided weakness and MRI scans suggested multiple sclerosis, her neurological exams showed only mild abnormalities, she had a normal steady gait, and she had not been treated for MS. (Tr. at 21.) The final point is simply incorrect; plaintiff regularly saw Dr. Rayman, who recommended that plaintiff's MS be treated symptomatically (e.g., Tr. at 587, 594), prescribing various medications (e.g., Tr. at 503). Dr. Rayman specifically noted that "there are no good treatments for PPMS per se." (Tr. at 503.) The ALJ also overlooked the medical records documenting balance and gait issues and use of a cane. (E.g., Tr. at 223-24, 236, 263, 266, 318, 337, 705.)

Fourth, the ALJ noted that although plaintiff alleged increasing dependence on her husband and daughter to perform chores around the house, "she continued to admit that she was able to handle all her personal care needs." (Tr. at 21.) "But it is a deficient analysis to assume that a claimant's ability to care for personal needs . . . is synonymous with an ability to be gainfully employed." Gaylor v. Astrue, 292 Fed. Appx. 506, 513 (7th Cir. 2008). Moreover, the ALJ overlooked plaintiff's statement that she became "dizzy, off balance when caring for my personal needs." (Tr. at 206.) Plaintiff also told her physical therapist that while she was able to complete activities of daily living, her arms became so painful she had to stop often. (Tr. at 637.) The ALJ also failed to explain how plaintiff's meager activities diminished her credibility. See Roddy, 2013 WL 197924, at *7 ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."). The ALJ noted that

31

plaintiff's depression improved when she took her medication, worsening when she stopped. (Tr. at 21.) But the ALJ overlooked the fact that plaintiff could not at times afford Effexor and Cymbalta (e.g., Tr. at 446), and other medications caused side effects, such a sedation and nightmares (e.g., Tr. at 594, 604; see also Tr. at 202). The ALJ cited records from Solutions Behavioral Health that plaintiff was improving, pulling out of one of the therapist's notes the statement: "'enjoy your trip,' suggestive that the claimant was about to go on vacation." (Tr. at 21.) Further review of this note reveals that plaintiff was going "up north" with a friend for a week. (Tr. at 523.) A later note indicated that plaintiff and her friend played cards and talked during the trip. (Tr. at 705.) So long as she does not engage in activities inconsistent with her claims, a disability applicant should be able to take a vacation without jeopardizing her claim for benefits. See Sheets v. Astrue, No. 4:11-CV-51, 2013 WL 425891, at *11 (N.D. Ind. Jan. 14, 2013), adopted, 2013 WL 425929 (N.D. Ind. Feb. 4, 2013); see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").

Finally, the ALJ stated that there was "evidence that the claimant stopped working for reasons not related to the allegedly disabling impairment(s) and that she has been able to perform work activities. The claimant admitted that she stopped working, not because she could not work at all, but because she did not feel she could work full time." (Tr. at 21.) Plaintiff testified that she quit working because her employer "cut the food program and she wanted me to do it all. And, I explained to her that I couldn't do it all by myself because I can't lift the pans and go up and down the stairs." (Tr. at 54.) In her disability report, plaintiff stated: "They wanted someone to work full time and I knew I couldn't do it." (Tr. at 161.) Both

32

statements reflect that plaintiff stopped working due to her impairments, not for some other reason (such as lack of motivation). Further, while an ALJ may consider part-time work efforts in evaluating the credibility of a claimant's allegations, he must explain how "part-time employment supports a conclusion that [the claimant] was able to work a full-time job, week in and week out, given her limitations." Jelinek, 662 F.3d at 812. The ALJ failed to do so here. See also Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time.").[12]

Because the ALJ failed to provide a sufficient analysis of plaintiff's credibility under the standards set forth in SSR 96-7p and 20 C.F.R. § 404.1529(c), the matter must be remanded for further proceedings on this basis as well. See Roddy, 2013 WL 197924, at *7; Terry v.

---

[12]The ALJ further stated in this paragraph of his decision that, "in 2008 discharge notes from the emergency room, [plaintiff] was noted as 'able to return to work at normal duty.'" (Tr. at 21.) The ALJ provided no citation for the quote, and I was unable to find this statement in the record. The ALJ also stated that "there is no evidence in the medical record of evidence that a medical provider has given her work restrictions." (Tr. at 21.) Dr. Gilligan imposed work restrictions, as discussed earlier; as the ALJ himself noted, Dr. Wolfla imposed lifting and driving restrictions after plaintiff's surgery. Earlier in his decision, the ALJ stated that plaintiff "failed to follow-up on recommendations made by the treating doctor. Despite being instructed in home exercise programs, the claimant did not continued [sic] with the programs. There is no evidence that she ever sought professional advice from a nutritionist." (Tr. at 20.) The ALJ may consider a claimant's failure to follow prescribed treatment, but he "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. The record in this case shows that plaintiff attended a physical therapy session in October 2009, at which she was instructed in a home exercise program. She was scheduled for one more session, which she did not attend. (Tr. at 658.) She returned to therapy in July 2010, explaining that she did the home exercise program for a couple of weeks but discontinued due to pain. (Tr. at 636.) She attended several PT sessions at that time, with a September 2, 2010 note indicating that she was discharged from physical therapy due to little change in pain. (Tr. at 633.) The ALJ failed to consider this evidence. Finally, I have found nothing in the record indicating that plaintiff's doctors referred her to a nutritionist, so it is hard to see how her failure to seek such advice denigrates her credibility.

33

<u>Astrue</u>, 580 F.3d 471, 478 (7th Cir. 2009).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of February, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

34